## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**AMQ INTERNATIONAL CORP.**,

      Plaintiff,

v.                                 Case No. 8:24-cv-01913-WFJ-CPT

**3TEK GLOBAL, LLC**,

      Defendant.

_____/

## **ORDER**

Before the Court are the parties' cross-motions for summary judgment. Defendant 3TEK Global, LLC ("3TEK") moves for summary judgment on all counts, Dkt. 52, Plaintiff AMQ International Corp. ("AMQ") responded in opposition, Dkt. 61, and Defendant 3TEK replied. Dkt. 68. Plaintiff AMQ moves for partial summary judgment on Counts VI and X of its Amended Complaint and on certain Affirmative Defenses raised by Defendant, Dkt. 50, and Defendant 3TEK responded in opposition. Dkt. 65. The Court heard oral argument regarding the pending motions on January 21, 2026. Dkts. 72, 74. Both parties then filed supplemental briefings for the Court's consideration. Dkts. 75, 77. Upon careful consideration, the Court denies-in-part and grants-in-part Defendant 3TEK's motion and denies-in-part and grants-in-part Plaintiff AMQ's motion.

## BACKGROUND

Defendant 3TEK manufactures and sells scrap processing equipment, including the Bravo 6280 Mobile Shredder, which is designed for ferrous scrap processing. Dkt. 53 ¶¶ 1, 3; Dkt. 62 ¶¶ 1, 3. This product is designed to be sold to small to medium sized customers in the scrap processing business. Dkt. 53 ¶ 2; Dkt. 62 ¶ 2. Plaintiff AMQ's business was initially started in 2011 as a used car dealership with automotive services, then expanded into real estate, but eventually moved into automotive recycling and scrapping. Dkt. 53 ¶¶ 6–8; Dkt. 62 ¶¶ 6–8. AMQ is owned by Ahmed Alatari, who had previously never engaged in the business of automotive recycling and scrapping. Dkt. 53 ¶ 9; Dkt. 62 ¶ 9.

In March 2022, 3TEK and AMQ executed a contract (the "Contract"), *see* Dkt. 53-2 at 8–16, whereby AMQ agreed to purchase from 3TEK a shredding system (collectively, the "shredding system") consisting of: (1) 3TEK Bravo 6280 Mobile Shredder, Infeed Conveyor, and Compact Pin-Puller; (2) ReConcept Mobile: Single Drum Magnet, Picking Station, and Fluff Remover; and (3) ECS (Eddy Current System) 60: Mobile Single Eddy Current Separator. Dkt. 53 ¶ 18; Dkt. 62 ¶ 18. This written agreement includes core terms such as identification of the parties, detailed specifications regarding the shredding system, pricing, payment terms, delivery, a limited warranty, and an allocation of certain performance responsibilities between the buyer and seller. *See* Dkt. 53-2 at 8–16. However, it does not include common

2

contractual provisions such as those regarding merger or disclaimer of warranties. *See id.* Although functioning as a contract, this document is labeled a "Revised Quotation," *id.* at 8, and the Court notes that it reads as such. This case arises from the ensuing dispute between the parties regarding the shredding system's capacity for processing automotive parts and the rate of ferrous output.

Pursuant to the Contract, the shredding system was delivered to Plaintiff AMQ's facility. Dkt. 53 ¶ 26; Dkt. 62 ¶ 26. On April 17, 2023, individuals from Defendant 3TEK arrived at the facility to assemble the shredding system, which was completed on April 26, 2023. *Id.* Plaintiff AMQ began operating the shredding system in August 2023. Dkt. 53 ¶ 29; Dkt. 62 ¶ 29.

On July 15, 2024, Plaintiff AMQ filed this action against Defendant 3TEK in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida. Dkt. 6-1. On August 14, 2024, this action was removed to the United States District Court for the Middle District of Florida. Dkt. 6-2 at 1. Plaintiff AMQ filed the operative Amended Complaint on September 30, 2024, alleging causes of action against Defendant 3TEK for: breach of contract (Count I); breach of express warranty (Count II); breach of implied warranty of merchantability (Count III); breach of implied warranty of fitness for a particular purpose (Count IV); rejection

of goods (Count VI[1]); negligent misrepresentation (Count VII), false advertising (Count VIII); violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count IX); and, as an alternative to rejection of goods, revocation of acceptance of goods (Count X). Dkt. 16. Defendant 3TEK now seeks summary judgment as to all Counts, Dkt. 52, whereas Plaintiff AMQ seeks partial summary judgment as to Counts VI and X. Dkt. 50.

On October 24, 2024, Defendant 3TEK filed its Answer to Plaintiff's Amended Complaint, which raised a total of twenty-one Affirmative Defenses. Dkt. 17. Of these, Plaintiff AMQ seeks partial summary judgment as to the third, fourth, eighth, seventeenth, eighteenth, and twentieth Affirmative Defenses. Dkt. 50.

## LEGAL STANDARD

Summary judgment is only appropriate when there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving

---

[1] The apparent scrivener's error of an omitted "Count V" appears in Plaintiff's initial complaint filed in state court, and it is not understood to represent any missing or withdrawn claims. *See* Dkt. 6-1 at 5.

party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001) (noting a court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party"). Once the moving party satisfies its initial burden, it shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e), (c). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The court may not weigh evidence to resolve a factual dispute; if a genuine issue of material fact is present, the court must deny summary judgment. *Hutcherson v. Progressive Corp.,* 984 F.2d 1152, 1155 (11th Cir. 1993). Likewise, the court should deny summary judgment if reasonable minds could differ on the inferences arising from undisputed facts. *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

Additionally, a district court is only required to consider "the cited materials" when deciding a summary judgment motion, Fed. R. Civ. P. 56(c)(3), and "[m]aking

district courts dig through volumes of documents and transcripts would shift the burden of sifting from petitioners to the courts. . . . [D]istrict court judges are not required to ferret out delectable facts buried in a massive record." *Chavez v. Sec'y Fla. Dep't of Corrs.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[T]here is no burden upon the district court to distill every potential argument that could be made based on the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) (per curiam) (quoting *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc)).

## DISCUSSION

### I.    Count I – Breach of Contract

Defendant 3TEK seeks summary judgment as to Count I. Dkt. 52. "The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." *Beck v. Lazard Freres & Co.,* LLC, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992)). As an initial matter, Defendant 3TEK acknowledges that "it is undisputed that the Contract is a valid and enforceable agreement." Dkt. 52 at 8. The remaining questions relate to breach and damages.

### a. Breach

Defendant 3TEK first argues that summary judgment should be granted in its favor as to Count I because "AMQ cannot meet its burden to demonstrate that 3TEK breached the Contract." *Id.* While Defendant 3TEK focuses on the written agreement as expressed in the Contract, *see id.* at 7–13, Plaintiff AMQ argues that the violations occurred as to certain "extra-contractual representations made by 3TEK in connection with the [Contract.]" Dkt. 61 at 3. Specifically, Plaintiff AMQ contends that Defendant 3TEK violated an agreement related to the shredding system's capability to process automotive parts at a rate of 20 tons per hour of ferrous output. *Id.* at 3–5.

"A merger or integration clause is '[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract.'" *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 n.1 (Fla. 1st DCA 2005) (quoting Black's Law Dictionary, 813 (7th ed. 1999)). Such a provision serves as a "highly persuasive statement that the parties intended the agreement to be totally integrated and generally works to prevent a party from introducing parol evidence[.]" *Id.* at 53. Without a merger clause, an agreement can be vulnerable to latent ambiguities. *See Fla. Atl. Univ. Bd. of Trs. v. Harbor Branch Oceanographic Inst. Found., Inc.*, 423 So. 3d 842, 847 n.5 (Fla. 2025) ("A latent ambiguity arises

when the language in a contract is clear and intelligible, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice between two or more possible meanings." (quoting *GE Fanuc Intelligent Platforms Embedded v. Brijot Imaging Sys., Inc.*, 51 So. 3d 1243, 1245 (Fla. 5th DCA 2011))).

Latent ambiguities are created "when the language of a contract does not deal in express terms with all aspects of the rights and duties of the parties to the agreement." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1096 (Fla. 1st DCA 1999); *see Jenkins*, 913 So. 2d at 56 ("Silence can create a latent ambiguity in some circumstances." (Ervin, J., dissenting) (citation omitted)). When the agreement contains a latent ambiguity, "the court's function is to ascertain the parties' intent at the time of making the contract[.]" *Id.* (citation omitted). To do so, Courts may consider parol—that is, extrinsic—evidence. *See id.*; *Fla. Atl. Univ.*, 423 So. 3d at 847 n.5 (Fla. 2025) ("[W]hen a contract has latent ambiguities, the intent of the parties can be demonstrated with parol evidence." (citation modified)).

Here, the Contract fails to contain a merger provision, and thus it never specifies whether it constitutes the entirety of the parties' intent at the time of contracting. *See* Dkt. 53-2 at 8–16. Further, the Contract is silent as to the shredding system's capacity for processing automotive parts and the expected rate of ferrous output. *See* Dkt. 53-2 at 8–16. The lack of merger provision and the silence as to

8

capacity creates a latent ambiguity, which necessitates the consideration of extrinsic evidence to determine the parties' intent. *See Cox*, 732 So. 2d at 1096.

Plaintiff AMQ points to specific "extra-contractual representations" to support its claim, such as a prior quotation, specifications on 3TEK's website about the shredding system's processing capabilities, text messages, and other various representations. Dkt. 61 at 4–5. First, on January 21, 2022, Defendant 3TEK provided Plaintiff AMQ with a quotation that included a section reading: "This system can capably produce 20 tons/hour output if fed sufficient stock by a trained crew." Dkt. 62-2 at 88. Further, on March 9, 2022, a principal of Defendant 3TEK texted those from Plaintiff AMQ that "[t]here is some great information contained [on 3TEK's website] on the Bravo shredding system that may help ur [sic] cause." *Id.* at 296. This website—reviewed by the owner of Plaintiff AMQ before executing the Contract—included "WHOLE CAR" and "AUTOMOTIVE & TRUCK PARTS" on a page titled "WHAT CAN THE BRAVO SHREDDER PROCESS?"[2] Dkt. 53 ¶ 14; Dkt. 62 ¶ 14. The website also listed "15–20 tons/hr. in ferrous output capacity" for the Bravo Shredder. Dkt. 53 ¶ 13; Dkt. 62 ¶ 13; Dkt. 62-3 at 6.

---

[2] Defendant 3TEK also asserts that when the user hovers over the "WHOLE CAR" listing that the following text box popped up: "The Bravo is not a dedicated car shredder like its bigger brother the Alpha. Yes, it can process a whole car but in limited quantities per day of not to exceed 25-30. Shear your incoming Cars: Some of our Bravo customers find they obtain higher throughput when they break or shear the cars into several pieces." Dkt. 53 ¶ 16. However, Plaintiff AMQ denies that "the very same text box feature existed on 3TEK's website when Mr. Alatari first visited and reviewed the website." Dkt. 62 ¶ 16 (citing Dkt. 53-3 at 21:71:4–5).

On February 5, 2022, a text message was also sent by a principal of Defendant 3TEK to that of Plaintiff AMQ, representing that "u [sic] can place automotive engines in [the shredding system.]" Dkt. 53-3 at 13. On February 17, 2022, it was again confirmed via text message that "the [shredding system] will process ferrous metal, car engine blocks and transmissions, non ferrous metals, etc." Dkt. 62-2 at 32.

Lastly, other various representations were made by Defendant 3TEK regarding the shredding system's capacity for processing automotive parts and the expected rate of ferrous output. For example, a principal of Plaintiff AMQ has attested that those from Defendant 3TEK claimed that the shredding system can process automotive parts and produce 20 tons of output per hour. Dkt. 53-4 at 22:74:5–9 ("Part of our questions was will it do the job that we are going to shred - - that we are going to use it for, which is for automotive parts, and the answer was yes. And would it do 20 tons an hour and the answer was yes.").

Defendant 3TEK argues that while it is true that the shredding system can "capably produce 20 tons/hour of ferrous output" and that it can "process automotive parts," it never guaranteed that it could produce 20 tons of ferrous output per hour *exclusively* processing automotive parts. Dkt. 68 at 2. Indeed, nowhere in the record does Defendant 3TEK affirm such. However, the Court must "review the facts and all reasonable inferences in the light most favorable" to Plaintiff AMQ, as the non-

10

moving party. *Pennington*, 261 F.3d at 1265. After reviewing the Contract and the available extrinsic evidence, the Court finds that reasonable minds could differ regarding what the parties' agreement as to the shredding system's capacity for processing automotive parts and the expected rate of ferrous output. *See Miranda,* 975 F.2d at 1534.

If it is inferred that the Contract represented a 20 ton per hour output from *exclusively* automotive parts, then breach might be established. It is undisputed that the shredding system's ferrous output fell short of 20 tons when employed by Plaintiff AMQ to process automotive parts, achieving a maximum processing rate of merely 8.5 tons per hour. Dkt. 51 ¶ 39; Dkt. 66 ¶ 39. But Defendant 3TEK argues this was due to Plaintiff AMQ having poor operators. Thus, the Court finds a dispute of fact as to breach.

### b. Damages

Defendant 3TEK further argues that "AMQ has no evidence of an injury for its breach of contract claim and summary judgment is therefore appropriate on this claim as a matter of law[.]" Dkt. 52 at 11. The Court disagrees and finds this to be in contest for trial.

Plaintiff has asserted two forms of damages throughout its filings: lost profits and difference in value.[3] *See, e.g.*, Dkt. 61 at 6, 10 ("[B]y Affidavit filed contemporaneously herewith, AMQ has sufficient evidence of its lost profits[.] . . . AMQ has presented sufficient evidence that the difference-in-value damages are equal to the purchase price AMQ paid for the [s]hredding [s]ystem, as the [s]hredding [s]ystem is valueless to AMQ.").

Regarding lost profit damages, the Court has excluded Alatari from testifying as to lost profits and further precluded any claim for lost profits in a prior order. Dkt. 81 at 3 ("[T]he Court grants Defendant's motion as to Alatari and excludes him from testifying about lost profits. The Court precludes by this Order Plaintiff's claim for lost profits."). Without repeating the analysis of this previous order, the Court notes that Alatari was found to not be qualified as a lay witness due to his lack of personal knowledge as to the profits of either AMQ or any closely comparable business. *Id.* (citing *4 Corners Ins., Inc. v. Sun Publ'ns of Fla., Inc.*, 5 So. 3d 780, 783 (Fla. 2d DCA 2009)). Thus, Plaintiff AMQ cannot proceed with lost profits damage in its breach of contract claim.

As to difference in value damages, Plaintiff AMQ argues that it has suffered a loss equivalent to a difference in value between the shredding system that was

---

[3] Although Plaintiff only discusses lost profits under the breach of contract claim in its response in opposition to Defendant 3TEK's Motion for Summary Judgment, the Court considers all forms damages contemplated throughout Plaintiff AMQ's filings.

12

allegedly contracted for and the shredding system that was received. *See* Dkt. 61 at 10. First, Plaintiff AMQ states that the shredding system is "valueless," and thus the damages are equivalent to the entire purchase price of the shredding system. *Id.* at 16. Alternatively, if the shredding system is not determined to be valueless, Plaintiff AMQ argues that there was a "gap in value." *Id.* at 16–17.

The argument that the shredding system is valueless is extinguished by Plaintiff AMQ's alternative argument of a "gap in value," as a certain level of value is demonstrated by the shredding system achieving a definite rate of ferrous output— even if it was lower than what was allegedly contracted for. *See id.* at 17 (arguing alternatively that the shredding system had a *lower* value—not *no* value—as it "achieved a processing rate at level well below 15–20 ferrous tons/ hour as represented by 3TEK"); *see also* Dkt. 66 ¶ 39 (showing that the shredding system's maximum measured ferrous output rate was 8.5 tons per hour when processing automotive parts for Plaintiff AMQ). The Court rejects Plaintiff AMQ's argument that because the shredding system could not sufficiently meet its business needs, then the shredding system was necessarily valueless for purposes of establishing damages. *See* Dkt. 61 at 16 ("[T]he [s]hredding [s]ystem was and is fundamentally unable to meet AMQ's business needs, and it therefore has no value to AMQ."); *see also A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1345–46 (S.D. Fla. 2021) (granting summary judgment after finding a product was not "valueless,"

13

as mere defects or missing features do not make such a product "*totally worthless*" where it retains some functionality or measurable benefit); *Moore v. GNC, Holdings, Inc.*, 2014 WL 12634919, at *5 (S.D. Fla. Mar. 18, 2014) (granting summary judgment where the plaintiffs failed to provide "any evidentiary or legal support for their assertion that the [p]roduct was valueless").

As to a "gap in value," Defendant 3TEK argues that Plaintiff AMQ "has no evidence that there was any difference in the market value of the [s]hredding [s]ystem as sold to AMQ versus the condition in which it was delivered to AMQ." Dkt. 52 at 22. Indeed, Plaintiff AMQ only provides evidence regarding the shredding system having a lower output rate than what was allegedly contracted for, but not regarding what that signifies related to its value. Evidence merely establishing a lower output rate does not demonstrate what the effect on the value might be; Plaintiff AMQ fails to provide evidence as to a "gap in value"—whether citing an exact amount or an estimate. Instead, such damages appear to be left to a future jury to "determine the proportionate reduction in value of the [s]hredding [s]ystem based on its reduced output capabilities." Dkt. 61 at 16–17. This may devolve into speculation at trial which the Court will not permit.

Defendant 3TEK has referenced Plaintiff AMQ's subsequent sale of the shredding system. See Dkt. 52 at 21 ("[T]here is no argument by AMQ that the [s]hredding [s]ystem is 'valueless,' . . . which is contradicted by the fact that AMQ

14

is in the process of selling the [s]hredding [s]ystem."); Dkt. 68 at 6 ("[I]n the Response, AMQ does not dispute that it is in the process of selling the [s]hredding [s]ystem and recovering substantial value in connection with such sale, which speaks volumes."). However, in its response, Plaintiff AMQ dismisses this matter and declines to provide any evidence of this sale. See Dkt. 61 at 16 ("[T]he assertion of counsel that AMQ is in the process of selling the [s]hredding [s]ystem . . . is insufficient as a matter of law because 3TEK made no reference to any factual materials on file in support."). Currently, the only details as to this sale were provided by Plaintiff AMQ's attorney at the hearing held January 21, 2026, where he stated that "the shredder has actually been sold for something like two-thirds of the total purchase price." Dkt. 73:22–24. The Court notes that evidence of this sale may have demonstrated a difference in value.

Plaintiff AMQ is cautioned that "[u]nder Florida law, damages are an essential element of an action for breach of contract." *See Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1300 (M.D. Fla. 2009) (citing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006)); *Farman v. Deutsche Bank Nat'l Tr. Co.*, 311 So. 3d 191, 195 (Fla. 2d DCA 2020) ("A damages award must be supported by legally sufficient evidence." (citation omitted)). This contested matter as to "difference in value damages" will be scrutinized at trial. Accordingly, the Court denies summary judgment as to Count I and it may proceed to trial.

15

**II.    Counts II, III, & IV – Breach of Express Warranty; Breach of Implied Warranty of Merchantability; Breach of Implied Warranty of Fitness for a Particular Purpose**

Defendant 3TEK seeks summary judgment as to Counts II, III, and IV, which are each breach of warranty claims. It is noted that the Contract failed to include a disclaimer of warranties. Dkt. 53-2 at 8–16. The Court analyzes each warranty claim as follows.

> *a. Count II – Breach of Express Warranty*

A claim for breach of express warranties under the Florida Uniform Commercial Code requires the plaintiff to establish "(1) the sale of goods; (2) the express warranty; (3) breach of the warranty; (4) notice to seller of the breach; and (5) the injuries sustained by the buyer as a result of the breach of express warranty." *Trophia v. Camping World, Inc.*, 616 F. Supp. 3d 1305, 1310 (M.D. Fla. 2022) (quoting *Jovine v. Abbott Labs., Inc.*, 795 F. Supp. 2d 1331, 1339 (S.D. Fla. 2011)).

Here, there is no dispute as to the sale of goods—namely, the Shredder System. Regarding an express warranty and its breach, under the Florida Uniform Commercial Code, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Fla. Stat. § 672.313(1)(a). "It is not necessary to the creation of an express warranty that

16

the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty." *Id.* § 672.313(2). Defendant 3TEK argues that "any of the alleged vague statements referenced by AMQ in the Amended Complaint would only constitute puffing, sales talk, or otherwise non-actionable opinion, and would not satisfy the threshold of an affirmation of fact required to be actionable." Dkt. 52 at 14. However, the Court must "review the facts and all reasonable inferences in the light most favorable" to Plaintiff AMQ. *Pennington*, 261 F.3d at 1265. After reviewing the same facts and inferences as were cited in the breach of contract analysis in the light most favorable to Plaintiff AMQ, *supra*, the Court finds that reasonable minds could differ regarding whether Defendant 3TEK made certain warranties regarding the shredding system's capacity for processing automotive parts and the expected rate of ferrous output. *See Miranda,* 975 F.2d at 1534.

Regarding notice to Defendant 3TEK as the seller—the record demonstrates that Plaintiff AMQ provided multiple notifications that the shredding system was producing a lower than expected output. For example, on April 27, 2024, an email was sent stating that "the problem is the [shredding system] is not making the amount we agreed on." Dkt. 62-2 at 126–27. On May 14, 2024, Plaintiff AMQ sent an email stating that "every month we pray that next month we will get to that 20 tons per hour that we purchased this piece of equipment for. . . . At rate of 8.5 tons per hour

17

which is not even half of what the machine is supposed to produce." Dkt. 62-4 at 146–47. As a final example, on June 23, 2024, Alatari sent an email providing details regarding the alleged "major issue of tonnage per hour that is nowhere near where it needs to be for this shredder to make us money." *Id.* at 148–51.

Lastly, as to the final element regarding injury, Florida law states that the "measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted[.]" Fla. Stat. § 672.714. The Court refers back to its previous analysis, as it has found such "difference in value damages" may proceed to trial. *Supra*. Accordingly, the Court denies summary judgment as to Count II.

### b. Count III – Breach of Implied Warranty of Merchantability

A claim for breach of implied warranty of merchantability requires the plaintiff to establish that "(1) the plaintiff was a foreseeable user of the product, (2) the product was used in the intended manner at the time of the injury, (3) the product was defective when transferred from the warrantor, and (4) the defect caused the injury." *Trophia*, 616 F. Supp. 3d at 1313 (quoting *Jovine*, 795 F. Supp. 2d at 1340).

Here, there is no dispute that Plaintiff AMQ was a foreseeable user of the shredding system and used it in its contemplated manner to process automotive parts. *See* Dkt. 52 at 14 ("[T]he [s]hredding [s]ystem's ordinary purpose is to process white

18

goods, miscellaneous structural shapes, auto and truck parts, plate, and rebar[.]");

Dkt. 61 at 2 (referring to the "processing automotive parts" as an "ordinary purpose[]

for which the [s]hredding [s]ystem is sold"); Dkt. 68 at 5 (describing the shredding

system's "ordinary purpose" as "efficient ferrous scrap metal processing and

processing metal that contains iron as its main component, which includes

automotive parts").

As to the final two elements, Plaintiff AMQ must demonstrate that a defect

existed in the shredding system, the defect existed at the time the shredding system

left the possession of Defendant 3TEK, and the defect caused the injury. *See Cooper

v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1223 (M.D. Fla. 2009).

Plaintiff AMQ claims—without citing to the record—that "there is substantial

evidence in the record that: (i) the 'ReConcept' component of the [s]hredding

[s]ystem could not keep up with processing certain automotive parts as feedstock;

(ii) belts used in the [s]hredding [s]ystem lacked the durability necessary for

processing automotive parts and pieces; and (iii) the [s]hredding [s]ystem would jam

on a routine basis when processing automotive parts." Dkt. 61 at 8.

This claim is likely duplicative, if damages there be, of the others. However,

the matter is sufficiently contested and may proceed to trial.  Accordingly, the Court

denies summary judgment as to Count III.

19

### c. *Count IV – Breach of Implied Warranty of Fitness for a Particular Purpose*

A claim for breach of implied warranty of fitness for a particular purpose requires the plaintiff to establish that (1) "the defendant, at the time the sale was made, knew of a particular purpose for which the goods were going to be used," and that (2) "the plaintiff relied upon the defendant's skill and judgment when purchasing said product." *Crawford v. Gold Kist, Inc.*, 614 F. Supp. 682, 687 (M.D. Fla. 1985) (citing *Fletcher Co. v. Melroe Mfg. Co.*, 238 So.2d 142 (Fla. 1st DCA 1970)); *see* Fla. Stat. § 672.315.

Florida law "distinguishes a 'particular purpose' [from a] use to which the goods are ordinarily put[.]" *First New England Fin. Corp. v. Woffard*, 421 So. 2d 590, 597 n.10 (Fla. 5th DCA 1982); *see McLeod v. W.S. Merrell Co.*, 174 So. 2d 736, 738 (Fla. 1965). A "particular purpose" means "a specific use by the buyer which is peculiar to the nature of his business," *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1100 (11th Cir. 1983), whereas an "ordinary purpose" includes "uses which are customarily made of the goods in question." Fla. Stat. § 672.315, cmt. n.2. "If the contemplated use of the good is the ordinary purpose for which the good is sold, no warranty of fitness for a particular purpose arises." *Martin v. Quick Spa*, No. 22-11730, 2023 WL 5321037, at *3 (11th Cir. Aug. 18, 2023) (citing *Royal Typewriter Co.*, 719 F.2d at 1100).

20

Here, it is a contested issue of fact that the seller was aware of the specific purpose for the purchase: to exclusively strip automotive parts—not to strip rebar or white goods. Plaintiff AMQ claims that "[t]he record contains substantial evidence that its intended use of the [s]hredding [s]ystem was for a particular purpose and that it envisioned a specific use of the [s]hredding [s]ystem for its recycling operation." Dkt. 61 at 9. Plaintiff AMQ contends that this "particular purpose" was to "process automotive parts and pieces, and that AMQ did not envision any other use for the [s]hredding [s]ystem." *Id.* Whether the buyer specifically relied on the seller's warranty for this particular purpose is a fact issue here. *See* Fla. Stat. § 672.315, cmt. n.1 ("Whether or not this warranty arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting."). Accordingly, the Court denies summary judgment as to Count IV and it may proceed to trial.

## III.   Count VII – Negligent Misrepresentation

Defendant 3TEK seeks summary judgment as to Count VII "as a matter of law" due to the economic loss rule, Dkt. 52 at 17; Dkt. 68 at 7, while Plaintiff AMQ argues that "the economic loss rule is inapplicable." Dkt. 61 at 11.

The economic loss rule "prohibit[s] a party from suing in tort for purely economic losses to a product or object provided to another for consideration, the rationale being that in those cases contract principles [are] more appropriate than tort

21

principles for resolving economic loss without an accompanying physical injury or property damage." *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 405 (Fla. 2013). Economic losses are defined as "damages for inadequate value, costs of repair and replacement of [a] defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Id.* at 401. "In other words, economic losses are 'disappointed economic expectations,' which are protected by contract law, rather than tort law." *Id.* ("A historical review of the doctrine reveals that it was introduced to address attempts to apply tort remedies to traditional contract law damages.").

Although the Florida Supreme Court at times "expand[ed] the application of the rule beyond its origins," *Moransais v. Heathman*, 744 So. 2d 973, 980 (Fla. 1999), it has since returned "the economic loss rule to its origin in products liability." *Tiara*, 110 So. 3d at 407. The *Tiara* court sought to retain the core of the economic loss rule, which "protect[s] manufacturers from liability for economic damages caused by a defective product beyond those damages provided by warranty law." *Id.* at 403.

Courts in this Circuit have found that the Florida Supreme Court, "by its dicta, did not intend to abridge the economic loss rule in the products liability setting to allow fraudulent inducement and negligent misrepresentation claims . . . where the action for fraud depends upon precisely the same allegations as a warranty claim—

22

i.e., a claim the product failed to work as promised." *Dawson v. Generac Power Sys.*, No. 8:24-cv-2412-KKM-LSG, 2025 WL 3754016, at *14 (M.D. Fla. Dec. 29, 2025) (citation modified) (quoting *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1338–39 (S.D. Fla. 2016)). "Concluding otherwise 'would allow the economic loss rule to be manipulated such that any time a purchaser received a defective product that did not cause any injuries or damage to other property, [he] could assert claims for [negligent misrepresentation] regarding the defect to avoid the economic loss rule.'" *Dawson*, 2025 WL 3754016, at *14 (quoting *Burns v. Winnebago Indus., Inc.*, No. 8:13-cv-1427-T-24, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013)).

Here, the Court finds the economic loss rule applies. Plaintiff AMQ's negligent misrepresentation claim is predicated on the same representations that form the core of its warranty claims—namely, the shredding system's capacity for processing automotive parts and the expected rate of ferrous output. *See* Dkt. 61 at 11 ("3TEK's representations to AMQ that the Shredding System can capably produce 15–20 tons/hour in ferrous output and process automotive parts and pieces were misrepresentations of material fact because the Shredding System is incapable of achieving the advertised processing rate and at best, struggles significantly when processing automotive parts."). Further, the claimed injury consists solely of disappointed economic expectations, without any accompanying personal injury or damage to other property. *See* Dkt. 16 at 15 ("As a direct and proximate result of

23

Defendant's negligent misrepresentations, Plaintiff has suffered damages, including but not limited to the purchase price of the Shredder, and all of its component parts, costs of assembly, costs of attempted repairs, and significant consequential and incidental damages.").

Allowing Plaintiff AMQ to proceed on this claim would effectively permit a tort remedy to supplant warranty remedies for the same defective product, which is precisely what the economic loss rule seeks to prevent. *See Dawson*, 2025 WL 3754016, at *13–15 (holding that a negligent misrepresentation claim was barred by the economic loss rule where the plaintiffs claimed only economic losses from defective generators and the alleged misrepresentation merely duplicated breach of warranty claims that the products failed to perform as promised); *Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1337–39 (S.D. Fla. 2013) (concluding that "the economic loss rule bars Plaintiffs' claim for negligent misrepresentation under the facts alleged," where the "cause of action for negligent misrepresentation is dependent on the same fundamental allegations contained in the breach of warranty claim—specifically, that Honda breached the terms of its Warranties by providing Plaintiffs with defective motorcycles"); *Burns*, 2013 WL 4437246, at *4 (finding that "the exceptions to the economic loss rule for fraudulent inducement and negligent misrepresentation do not apply," where the plaintiff alleged only economic loss from a defective product and attempted to recast a products liability claim as

24

tort claims); *see also See Takata*, 193 F. Supp. 3d at 1339 ("Usually claims for negligent misrepresentation are barred by the economic loss rule where, as here, there are claims for breach of warranty alongside tort claims and the allegations contained in both are similar." (quoting *Aprigliano*, 979 F. Supp. 2d at 1338)); *Thompson v. P&G*, No. 18-cv-60107, 2018 WL 5113052, *3 (S.D. Fla. Oct. 19, 2018) ("[W]hile Plaintiffs claim that this is not a 'products liability' case, that argument is unavailing. If the gravamen of the case is that defendant's product failed to conform to its label, . . . the economic loss rule bars tort claims, including negligent misrepresentation claims, seeking solely economic damages." (citation modified)). The Court applies the economic loss rule here and thus Plaintiff AMQ's negligent misrepresentation claim is precluded. Accordingly, the Court grants summary judgment in favor of Defendant 3TEK as to Count VII.

## IV.  Count VIII: False Advertising

Defendant 3TEK seeks summary judgment as to Count VIII.[4] A claim for false or misleading advertising under Florida law requires the plaintiff to establish that "(1) the representor made a misrepresentation of a material fact; (2) the representor knew or should have known of the falsity of the statement; (3) the representor intended that the representation would induce another to rely and act on it; and (4)

---

[4] Defendant 3TEK originally addressed the claim of false advertising under the Lanham Act, Dkt. 52 at 19–20, but in its response in opposition to the motion for summary judgment, Plaintiff AMQ specified that it is discussing false advertising under Fla. Stat. § 817.41(1). Dkt. 61 at 12. Defendant 3TEK raised an issue as to pleading fraud with specificity under Federal Rule of Civil Procedure 9(b), but the Court does not address that matter here.

the plaintiff suffered injury in justifiable reliance on the representation." *Akai Custom Guns, LLC v. KKM Precision, Inc.*, 707 F. Supp. 3d 1273, 1286 (S.D. Fla. 2023) (citing *Vance v. Indian Hammock Hunt & Riding Club*, 403 So. 2d 1367, 1370–72 (Fla. 4th DCA 1981)).

Regarding the first element, Plaintiff AMQ argues that "3TEK represented to AMQ that the Shredding System can capably produce 15-20 tons/hour in ferrous output, and process automotive parts and pieces," and that "[t]hese representations were misleading and misrepresentations of material fact because the [s]hredding [s]ystem is incapable of achieving the advertised processing rate and at best, struggles significantly when processing automotive parts." Dkt. 61 at 13. After reviewing the same facts and inferences as were cited in the breach of contract analysis in the light most favorable to Plaintiff AMQ, *supra*, the Court finds that reasonable minds could differ regarding whether Defendant 3TEK represented a ferrous output of 20 tons per hour when *exclusively* processing automotive parts. *See Miranda*, 975 F.2d at 1534.

Additionally, a principal of Defendant 3TEK testified that while the target ferrous output might be attainable with "the right mix of scrap" (as opposed to exclusively automotive parts), he was "not aware" of any customer that "runs primarily automotive feedstock that can achieve fifteen to twenty tons per hour without a pre-shredder[.]" Dkt. 53-5 at 215:71:5–23. The Court finds that this

26

testimony further supports the existence of a potential misrepresentation and may also satisfy the second element by indicating that Defendant 3TEK knew or should have known that its alleged claim—that the shredding system, as sold to AMQ, could achieve the target output using only automotive parts—was false. This evidence could allow a reasonable factfinder to infer both that the representation was false and that Defendant 3TEK knew or should have known such. This issue remains in dispute.

As to the third element, the record arguably demonstrates that Defendant 3TEK made aforementioned representations about the shredding system's capacity and output in order to induce Plaintiff AMQ to rely and act on them. Here, text messages were sent from Defendant 3TEK to Plaintiff AMQ, directing them to the 3TEK website, Dkt. 62-2 at 296, which represented that the shredding system could process "automotive & truck parts," Dkt. 62 ¶ 14, and that it had "15–20 tons/hr. in ferrous output capacity[.]" Dkt. 62-3 at 6. Further, there is evidence of instances where Defendant 3TEK communicated that one can use the shredding system for automotive parts and that it could produce up to 20 tons of ferrous output. *See, e.g.*, Dkt. 53-3 at 13; Dkt. 53-4 at 22:74:5–9; Dkt. 62-2 at 29. The Court finds that a reasonable jury could find that Defendant 3TEK made these representations to induce Plaintiff AMQ to purchase the shredding system.

Lastly, as to an injury suffered in justifiable reliance on the representations, the Court has found that the issue of injury is most suitable for trial. *Supra*. Specifically regarding justifiable reliance, Plaintiff AMQ has provided testimony that a principal relied upon these representations when deciding upon purchasing the shredding system. *See* Dkt. 53-3 at 20:66:5–7 ("I relied on the representations that were made and the information that was listed on the website."); *id.* at 33:121:15–20 ("My decision came based on the representations that were made by the sales representative, Mr. Padula, and all my advertising material that we were advised to look at as part of, you know, information about the [shredding system]."); *id.* 47:176:20–21 ("We relied on the representation that [the shredding system] can process auto parts[.]"). In consideration of this testimony, the Court finds that a reasonable jury could find that Plaintiff reasonably relied on Defendant 3TEK's representations. Thus, each element of false advertising under Florida law might be demonstrated by the record. Accordingly, the Court denies summary judgment as to Count VIII and it may proceed to trial.

## V.    Count IX – Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA")

Defendant 3TEK seeks summary judgment as to Count IX. A claim for negligent misrepresentation requires the plaintiff to establish "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Pop v. LuliFama.com LLC*,

145 F.4th 1285, 1295 n.9 (11th Cir. 2025) (quoting *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)). "Under FDUTPA, a 'deceptive act' is 'one that is likely to mislead consumers[.]'" *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1360–61 (S.D. Fla. 2012) (quoting *Washington v. LaSalle Bank Nat'l Ass'n*, 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011)).

"While in some factual scenarios a FDUTPA claim can coexist with a breach of contract claim, the Florida Supreme Court has rejected the proposition that FDUTPA was intended to convert every breach of contract into a FDUTPA claim." *Ellenwood v. World Triathlon Corp.*, No. 8:20-cv-1182-T-60AEP, 2021 WL 62482, at *4 (M.D. Fla. Jan. 7, 2021) (citing *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003)). Florida law permits a FDUTPA claim to travel with a related breach of contract claim, *see PNR, Inc.*, 842 So. 2d at 777 n.2 ("To the extent an action giving rise to a breach of contract . . . may also constitute an unfair or deceptive act, such a claim is and has always been cognizable under the FDUTPA."), but it may only do so long as it does not "rely solely on a violation of the Agreement as a basis for assertion of [the] FDUTPA claim." *Kenneth F. Hackett & Assocs., Inc. v. GE Cap. Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010). "To state a claim under FDUTPA concerning conduct that is specifically covered by a written contract, significant allegations of unfair, unconscionable, or deceptive

29

conduct must be made." *Ellenwood*, 2021 WL 62482, at *4 (citing *Hache v. Damon Corp.*, No. 8:07-cv-1248-T-30EAJ, 2008 WL 912434 at *2 (M.D. Fla. Apr. 1, 2008)).

Here, the record fails to establish any FDUTPA-level unfair, unconscionable, or deceptive conduct. The Court has permitted the false advertising claim to proceed to trial, but that claim barely surmounts the elements. Given that this is basically a contract/warranty dispute, the caution due under the Florida Supreme Court's guidance about FDUTPA supports granting Defendant 3TEK's motion. The FDUTPA claim here is a breach of contract claim in improper FDUTPA clothing. The claimed deceptive representations regarding the shredding system's capacity and ferrous output are intertwined with the performance expectations allegedly agreed upon and amount to no more than a restatement of Plaintiff AMQ's claims for breach of contract and warranty. Plaintiff AMQ has not produced evidence from which a reasonable jury could find that Defendant 3TEK engaged in conduct that was specifically deceptive in a manner contemplated by FDUTPA. The Court finds that the allegations underlying this claim sound in contract and do not constitute an independent violation of FDUTPA. Accordingly, the Court grants summary judgment in favor of Defendant 3TEK as to Count IX.

30

## VI.    Counts VI & X – Rejection of Goods, or alternatively Revocation of Acceptance of Goods

Both parties seek summary judgment as to Counts VI and X. The legal standard for summary judgment is especially important when there are cross-motions for summary judgment. "[C]ourts should be very careful in their analysis to ensure that the proper party receives the benefit of the summary judgment standard." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 959 (11th Cir. 2023). "When parties jointly move for summary judgment, the court has three options: granting summary judgment for the plaintiff under the defendant's best case, granting summary judgment for the defendant under the plaintiff's best case, or denying both motions for summary judgment and proceeding to trial." *Id.*

Plaintiff AMQ argues that it is entitled to summary judgment as to Count VI because it "rejected the [s]hredding [s]ystem within a reasonable time after delivery." Dkt. 50 at 8. Alternatively, it argues entitlement to summary judgment as to Count X because "AMQ provided 3TEK with sufficient and timely notice of revocation." *Id.* at 10. Defendant 3TEK argues that it is entitled to summary judgment as to Counts VI and X because Plaintiff AMQ accepted the shredding system and thus could not reject it, and that "any attempts at revocation by AMQ of the [s]hredding [s]ystem were untimely." Dkt. 52 at 22, 24.

31

Under Florida law, "[a]cceptance of goods by the buyer precludes rejection of the goods accepted[.]" Fla. Stat. § 672.607(2). "Acceptance of goods occurs when the buyer . . . [f]ails to make an effective rejection . . . , but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them[.]" *Id.* § 672.606(1)(b). Revocation may occur after acceptance is effected and only "within a reasonable time after the buyer discovers or should have discovered the ground for it." *Id.* § 672.608(1)(a).

Here, whether Plaintiff AMQ accepted the shredding system is contested. While Defendant 3TEK asserts that "AMQ accepted the [s]hredding [s]ystem after a reasonable opportunity to inspect it," Dkt. 65 at 15, Plaintiff AMQ argues that it "rejected the [s]hredding [s]ystem within a reasonable time after delivery." Dkt. 50 at 8. "[W]hether the buyer's rejection of goods was within a reasonable time pursuant to the UCC is a factual issue to be decided by a jury and cannot be resolved on summary judgment." *Twin Rivers Eng'g, Inc. v. Pacer USA, LLC*, 257 So. 3d 140, 142 (Fla. 4th DCA 2018) (citations omitted); *see* Fla. Stat. § 671.204(1) ("Whether a time for taking an action required by this code is reasonable depends on the nature, purpose, and circumstances of the action.").

This creates a genuine dispute of material fact as to as to both rejection and revocation. If Plaintiff AMQ accepted the shredding system, rejection is precluded; if it did not accept it, revocation is immaterial. Moreover, even assuming acceptance,

32

whether any revocation was timely remains a contested question of fact. Accordingly, the Court denies summary judgment as to Counts VI and X and they may proceed to trial.

## VII.   Affirmative Defenses

Plaintiff AMQ seeks partial summary judgment as to the third, fourth, eighth, seventeenth, eighteenth, and twentieth Affirmative Defenses. Dkt. 50. "A court may grant partial summary judgment on affirmative defenses, so long as the movant meets its burden of showing that the defenses cannot be maintained by a preponderance of the evidence." *FDIC v. Hall*, No. 8:14-cv-834-T-24 TGW, 2016 WL 7325590, at *2 (M.D. Fla. Aug. 29, 2016) (citing *Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007)). "Merely stating there is no evidence to support the affirmative defenses is not enough to prevail on summary judgment." *Id.* (citing *United States v. Four Parcels of Prop. in Green and Tuscaloosa Ctys. in the State of Ala.*, 941 F.2d 1428, 1437–38 n.19 (11th Cir. 1991)).

### a.   Third & Eighteenth Affirmative Defenses

Defendant 3TEK's third affirmative defense asserts that "AMQ's claims are barred or reduced, in whole or in part, by the doctrines of payment, release, accord and satisfaction, waiver, unclean hands, ratification, and/or estoppel (promissory, judicial, legal, or equitable), quasi-estoppel, unjust enrichment, parole evidence, the statute of frauds, the economic loss rule, assumption of the risk, failure to mitigate,

and/or election of remedies." Dkt. 17 at 9. The eighteenth affirmative defense provides further miscellaneous defenses, listing: "accord and satisfaction, arbitration and award, assumption of risk, coercion, contract, contributory negligence, discharge in bankruptcy, duress, economic duress, election of remedies, estoppel, failure of consideration, illegality, injury by fellow servant, laches, license, payment, release, res judicata, satisfaction, statute of frauds, waiver, the failure of AMQ to mitigate damages or take reasonable steps to avoid damages, the failure of AMQ to exercise ordinary care, and any other matter constituting an avoidance or affirmative defense." *Id.* at 13.

Plaintiff AMQ seeks summary judgment here because Defendant 3TEK "attempts to list a variety of potential defenses without any factual support." Dkt. 50 at 13. Indeed, "a court must not tolerate shotgun pleading of affirmative defenses, and should strike vague and ambiguous defenses which do not respond to any particular count, allegation or legal basis of a complaint." *Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318 (S.D. Fla. 2005) (citations omitted). However, Defendant 3TEK argues that it has narrowed these defenses to: "economic loss" as a defense to the negligent misrepresentation claim, as well as "failure to mitigate" and "election of remedies" as defenses to any damages sought from the breach of contract claim. Dkt. 65 at 18–19. The Court will allow for these three defenses to be considered. Accordingly, the Court denies-in-part and grants-in-part

34

summary judgment in favor of Plaintiff AMQ as to the third and eighteenth affirmative defenses. The Court notes that the "election of remedies" defense is unlikely to be an issue for the jury; rather, it is likely for the judge after review of the trial evidence.

### b. Fourth Affirmative Defense

Defendant 3TEK's fourth affirmative defense asserts that "AMQ's claims are barred, in whole or in part, inasmuch as AMQ has failed to satisfy conditions precedent." Dkt. 17 at 10. Plaintiff AMQ seeks summary judgment here because Defendant 3TEK did not allege this defense with particularity, and Federal Rule of Civil Procedures 9(c) requires that "when denying that a condition precedent has occurred or been performed, a party must do so with particularity." Dkt. 50 at 14–15. However, Defendant 3TEK provides the context that the fourth affirmative defense relates to the tenth, that "3TEK had no notice of any alleged defect in the subject parts which would have enabled 3TEK to correct said alleged defect." Dkt. 65 at 19. The condition precedent that Plaintiff AMQ allegedly failed to satisfy is notice, as required under Florida law. *Id.* (citing Fla. Stat. § 672.607(3)(a)). The Court will allow for this defense to be proved at trial but, if not proved, will be stricken prior to jury consideration. Accordingly, the Court denies summary judgment as to the fourth affirmative defense.

35

### c. *Eighth, Seventeenth, & Twentieth Affirmative Defenses*

Defendant 3TEK's eighth and seventeenth affirmative defenses have been withdrawn.[5] Dkt. 65 at 17. Further, as to its twentieth affirmative defense, Defendant 3TEK "acknowledges that to the extent AMQ articulates additional and/or unpled claims not previously asserted, 3TEK will be required to move for leave to address such claims." *Id.* Accordingly, the Court grants summary judgment in favor of Plaintiff AMQ as to the eighth, seventeenth, and twentieth affirmative defenses.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. Defendant 3TEK Global, LLC's Motion for Summary Judgment, Dkt. 52, is **DENIED-IN-PART** and **GRANTED-IN-PART**. Summary judgment as to Defendant 3TEK Global, LLC's motion is adjudged as follows:

    a. Denied as to Count I (breach of contract);

    b. Denied as to Count II (breach of express warranty);

    c. Denied as to Count III (breach of implied warranty of merchantability);

---

[5] Defendant 3TEK states in its response that, "[w]ith respect to Affirmative Defense 7 and 8, 3TEK withdraws such defenses based on AMQ's stipulation in the Motion that it is not seeking exemplary or punitive damages, and that it is not asserting as part of its claims a failure to warn." Dkt. 65 at 17. However, Plaintiff AMQ is seeking partial summary judgment not on the seventh and eighth affirmative defenses, but on the eighth and seventeenth affirmative defenses. Dkt. 50 at 15–16. Additionally, Defendant 3TEK withdraws these defenses because it is not seeking certain damages, Dkt. 65 at 17, but the seventh affirmative defense is unrelated to damages, Dkt. 17 at 10, while the seventeenth affirmative defense discusses exemplary and punitive damages. *Id.* at 12. For these reasons, the Court construes Defendant 3TEK's response to withdraw the eighth and seventeenth affirmative defenses.

d.  Denied as to Count IV (breach of implied warranty of fitness for a particular purpose);

e.  Granted in favor of Defendant as to Count VII (negligent misrepresentation);

f.  Denied as to Count VIII (false advertising);

g.  Granted in favor of Defendant as to Count IX (FDUTPA);

h.  Denied as to Count VI (rejection of goods); and

i.  Denied as to Count X (revocation of acceptance of goods).

2.  Plaintiff AMQ International Corp.'s Motion for Partial Summary Judgment, Dkt. 50, is **DENIED-IN-PART** and **GRANTED-IN-PART**. Summary judgment as to Plaintiff's motion is adjudged as follows:

a.  Denied as to Count VI (rejection of goods);

b.  Denied as to Count X (revocation of acceptance of goods);

c.  Denied-in-part as to the defenses of economic loss, failure to mitigate, and election of remedies, and granted-in-part in favor of Plaintiff as to the remaining defenses of third and eighteenth affirmative defenses;

d.  Denied as to the fourth affirmative defense; and

e.  Granted in favor of Plaintiff as to the eighth, seventeenth, and twentieth affirmative defenses.

**DONE** and **ORDERED** in Tampa, Florida, on May 7, 2026.

37

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**Copies Provided To**
Counsels of Record

38